UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ANGELICA ULLOA,                         :

                     Plaintiff,         :     13 Civ. 4518 (ER)(HBP)

     -against-                          :     REPORT AND
                                              RECOMMENDATION
CAROLYN W. COLVIN, acting               :
Commissioner of Social Security,
                                        :
                     Defendant.         :
----------------------------------X

          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE EDGARDO RAMOS, United States District

Judge,


I.  Introduction


          Plaintiff, Angelica Ulloa, brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying her

application for disability insurance benefits ("DIB") and supple-

mental security income ("SSI").  The Commissioner has moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure (Notice of Motion, dated December 6,

2013 (Docket Item 12)).  Plaintiff has filed a cross-motion also

seeking judgment on the pleadings (Notice of Motion, dated March 10, 2014 (Docket Item 22)).

For the reasons set forth below, I respectfully recommend that plaintiff's motion be granted to the extent of remanding plaintiff's case for further proceedings consistent with this report and recommendation and that the Commissioner's motion be denied in all respects.

II.  Facts

A.  Procedural
    Background

Plaintiff filed an application for DIB and SSI on February 22, 2011 alleging that she had been disabled since January 1, 2009 (Tr.[1] 89, 91, 96).  Plaintiff alleges she was disabled due to depression, post-traumatic stress disorder ("PTSD") and insomnia (Tr. 163).  The Social Security Administration ("SSA") denied plaintiff's application, finding that she was not disabled (Tr. 52, 60).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (see Tr. 25, 27).  ALJ Gitel Reich conducted a hearing on January 3,

---

[1]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated August 9, 2013 (Docket Item 11)).

2012 (Tr. 27-47).  In a decision dated January 30, 2012, ALJ
Reich determined that plaintiff was not disabled within the
meaning of the Act (Tr. 12-21).  On April 4, 2012, plaintiff
requested review by the Appeals Council (Tr. 6).  The ALJ's
decision became the final decision of the Commissioner on April
23, 2013 when the Appeals Council denied plaintiff's request for
review (Tr. 1-5).

Plaintiff commenced this action seeking review of the
Commissioner's decision on June 26, 2013 (Complaint (Docket Item
2)).  On December 6, 2013, the Commissioner moved for judgment on
the pleadings (Docket Item 12), and on March 11, 2014 plaintiff
cross-moved for judgment on the pleadings (Docket Item 22).

    B.   Plaintiff's
        <u>Social Background</u>

Plaintiff was born June 8, 1972 and was 36 years old at
the alleged disability onset date (Tr. 20).  She holds a General
Educational Development diploma and speaks English (Tr. 20, 164).
She was employed as an office manager at a landscaping business
from February 2000 through April 2009 (Tr. 31), and she held a
position as office manager for a real estate law firm for a few
months in 1998 (Tr. 164).  Plaintiff's work for the landscaping
business required her to manage forty-five people and to lift

objects weighing twenty to fifty pounds (Tr. 155).  She testified that the job required her to sit for about two hours per day, and during the remaining seven hours of her work day she either walked or stood (Tr. 31-32).

According to a Function Report completed by plaintiff's SSI case manager on February 7, 2011 (Tr. 112-19), at that time, plaintiff lived with her mother, and she described her typical day as consisting of morning ablutions, making herself breakfast and then watching television, unless she had an appointment scheduled (see Tr. 112, 114).  She reported spending the day in her pajamas, not brushing her hair and eating irregularly (Tr. 113).  While plaintiff reported "washing up" in the mornings, she also reported sometimes going up to four days without bathing (Tr. 112-13).  She prepared her own meals approximately four times per week and was able to take her medication consistently (Tr. 114).  She also took care of her two cats, feeding them and changing their litter (Tr. 113).  She did not do other chores, handle her finances or go shopping (Tr. 114-15).  She also reported that she did not spend time with people other than her family, but that she did not have any problems getting along with her family (Tr. 116-17).  When she did leave her apartment, she did not go out alone, and she either took public transportation or walked (Tr. 115).  Plaintiff slept only two to five hours per

night (Tr. 113) and reported difficulties with concentration, memory and completion of tasks, but she reported having no issues with instructions (Tr. 117).  The report noted that plaintiff cried during the interview and that plaintiff said she was unable to control her crying (Tr. 118).  Plaintiff also reported that she reacted to stress aggressively, by being irritable and crying (Tr. 118).

In a subsequent Function Report, dated about two months later (Tr. 143-51), plaintiff reported that she prepared her own meals once a week (Tr. 145) and only left the apartment for medical appointments (Tr. 146).  Plaintiff reported that she needed to be reminded to take her medication (Tr. 145), that she spent all day in her pajamas, did not wash or bathe for days and sometimes weeks and did not brush her hair or shave her legs (Tr. 144-45).  Plaintiff wrote that she watched television all day or sat and stared at the wall (Tr. 144).  She reported that she did not read because she could not concentrate (Tr. 148), and that she did "not talk on the phone or wish to speak or see anyone" (Tr. 148).

5

C.   Plaintiff's
     Medical Background

     1.   Dr. Rosario-Amaro and
          Bellevue and Harlem Hospitals

Dr. Francisco E. Rosario-Amaro saw plaintiff on June 15, 2010 (Tr. 178-80).  He found that plaintiff was in a "[g]eneral[ly] good state of health[,] no weakness[,] no fatigue[,] no fever [and had] good exercise tolerance" (Tr. 178).  At that time plaintiff stated that in the two weeks preceding the visit, she had not felt "down[,] depressed or hopeless," nor had she had "[l]ittle interest or pleasure in doing things" (Tr. 178).  She also denied suicidal thoughts (Tr. 178).  Plaintiff again denied suicidal thoughts when Dr. Rosario-Amaro saw her three months later on September 29, 2010, though at that time he referred her to a psychiatrist for treatment for depression (Tr. 180).

Plaintiff visited the Emergency Room at Bellevue Hospital on July 6, 2010 (Tr. 183).  When interviewed by a physician, plaintiff admitted that she had told the triage nurse that she had suicidal ideations, but that they had passed (Tr. 183).  She reported that she had received a referral to see a psychiatrist on an outpatient basis, but needed Medicaid to pay for the psychiatrist (Tr. 183).  She explained that she believed

she could be approved for Medicaid more quickly "through the
[E]mergency [R]oom" (Tr. 183).  Plaintiff also stated that she
had been unable to fill completely a prescription for Zoloft for
financial reasons (Tr. 183).  Plaintiff was given the telephone
number of a suicide hotline and agreed to return to the Emergency
Room "if she was feeling unsafe" (Tr. 183).

Plaintiff visited Harlem Hospital Center on September
3, 2010 (Tr. 189).  The attending physician reported that plain-
tiff was "alert and oriented[ ]x3 [and] appropriately dressed,"
her "face was red because was crying," but she "denie[d] sui-
cidal/homicidal ideation [and] auditory or visual hallucinations"
(Tr. 189).  Plaintiff did report "feeling depress[ed] and diffi-
culty sleeping" (Tr. 189).

2.   The FEGS[2] Reports

A FEGS report dated October 14, 2010 states that
plaintiff was suffering from depression, PTSD, insomnia and
"hands shaking," but that she had no current suicidal or homi-

---

[2]Federal Employment and Guidance Service ("FEGS") WeCare is
a New York City program that "helps [public] assistance
applicants and recipients with complex clinical barriers to
employment, including medical, mental health, and substance abuse
conditions, to obtain employment or federal disability benefits."
FEGS: WeCare, FEGS Health & Human Servs.,
http://www.fegs.org/what-we-do/employment-
workforce/jobseekers/wecare (last visited Oct. 29, 2014).

cidal ideations and no auditory or visual hallucinations (Tr. 193).  The report notes that plaintiff formerly had auditory hallucinations but that they "resolved with medication [a] few mo[nths] ago" (Tr. 198).  The report also lists Dr. Jolayemi as plaintiff's then current treating psychiatrist and indicates that plaintiff last saw Dr. Jolayemi "within [the] last month" (Tr. 193).

A FEGS report dated November 8, 2010 restates plaintiff's diagnosis of October 14, 2010 and states that plaintiff reported that she last had auditory and visual hallucinations ten months earlier (Tr. 201-03).  The report also states that plaintiff reported that she had gone to Harlem Hospital and had seen Dr. Jolayemi (Tr. 204).

A FEGS report completed January 14, 2011 recommended "ssi and psych," stating that plaintiff's "clinical condition has not stabilized as per treating physician who does not expect improvement within the next 12 months" (Tr. 211).

3.   Dr. Nuñez

Dr. Giovanny Nuñez, plaintiff's treating physician, completed a Psychiatric/Psychological Impairment Questionnaire on April 4, 2011 (Tr. 264-71).  Dr. Nuñez indicated on this form that plaintiff's first date of treatment was November 30, 2010,

that the most recent exam was March 18, 2011 and that he had been seeing plaintiff on a monthly basis (Tr. 264).  Dr. Nuñez diagnosed plaintiff with PTSD and severe major depressive disorder with psychotic features (Tr. 264).  He indicated that plaintiff had poor memory, appetite disturbance with weight change, sleep and mood disturbance, psychomotor agitation or retardation, emotional lability,[3] anhedonia,[4] recurrent panic attacks, hostility and irritability, suicidal ideation or attempts, paranoia or inappropriate suspiciousness, delusions or hallucinations, perceptual disturbances, difficulty thinking or concentrating, persistent irrational fears, feelings of guilt or worthlessness, social withdrawal or isolation, decreased energy, persistent intrusive recollections of a traumatic experience and generalized persistent anxiety (Tr. 265).  Dr. Nuñez wrote that the most consistent and severe symptoms were "depression, paranoid ideations, low energy, poor sleep" (Tr. 266).

Dr. Nuñez also indicated that plaintiff's symptoms resulted in marked limitations in five out of eight categories of Sustained Concentration and Persistence, and marked limitations

---

[3]"Lability" is "emotional instability[,] rapidly changing emotions."  Dorland's Illustrated Medical Dictionary, ("Dorland's") at 886 (27th ed. 1998).

[4]"Anhedonia" is "total loss of feeling of pleasure in acts that normally give pleasure."  Dorland's at 89.

in plaintiff's ability to understand and remember detailed
instructions (Tr. 267).  Dr. Nuñez opined that plaintiff would
have marked limitations in several other areas, including inter-
actions with coworkers and superiors and an inability to travel
to unfamiliar places or take public transportation (Tr. 268-69).

          4.   The Consultative
               Examiners

     Dr. Marilee Mescon, an SSA consultative examiner,
examined plaintiff on May 3, 2011 (Tr. 234-37).  Dr. Mescon
indicated that plaintiff reported having back pain for the past
twenty years and that the pain radiates out to her right hip and
down to her right knee and is worse when she stands (Tr. 234).
Dr. Mescon reported that plaintiff had "no limitations in [her]
ability to sit, stand, climb, push, pull, or carry heavy objects"
(Tr. 237).

     Dr. Michael Alexander, an SSA consultative examiner,
also examined plaintiff on May 3, 2011.  He reported that plain-
tiff stated she suffered from a hand tremor, stomach pain and
breathing difficulties (Tr. 238).  He also noted that plaintiff
stated she had no homicidal or suicidal ideation and that plain-
tiff reported receiving treatment regularly from a psychiatrist
and a therapist (Tr. 238).  Plaintiff reported normal sleep and

appetite and exhibited no evidence of "panic or manic related symptoms" (Tr. 238).  Dr. Alexander noted that plaintiff was "cooperative [and] friendly," and her concentration and memory were "intact" (Tr. 239).

Dr. Inman-Dundon, an SSA consultative psychologist, completed a psychiatric review form on May 31, 2011 (Tr. 242-55). Dr. Inman-Dundon checked only two boxes when reviewing plaintiff's condition, one indicating that plaintiff's condition did not constitute a severe impairment and one indicating that plaintiff's condition was an affective disorder (Tr. 242).  There are no reasons listed for Dr. Inman-Dundon's conclusions, and there is no indication as to whether Dr. Inman-Dundon examined plaintiff or only looked at her records.

5.   Dr. Jolayemi

Plaintiff submitted a Treating Physician Wellness Plan Report dated December 28, 2010 from Dr. Jolayemi to the Appeals Council (see Tr. 283-84).  In this report, Dr. Jolayemi indicated that plaintiff had poor energy, poor memory, poor concentration, labile mood and poor frustration tolerance, and that these symptoms "severely limit [plaintiff's] functioning" (Tr. 284). Dr. Jolayemi also wrote that plaintiff had a history of panic attacks, flashbacks and auditory hallucinations (Tr. 283).

11

D.   Proceedings
     <u>Before the ALJ</u>

Because plaintiff had income through July 2009, the ALJ amended plaintiff's alleged disability onset date to September 1, 2009 (Tr. 33-38).

Plaintiff testified that she suffers from auditory hallucinations (Tr. 35) and hand tremors (Tr. 40), and is unable to walk more than one block without "getting winded" (Tr. 41). In response to the ALJ's question about what her respiratory problem was "related to," plaintiff testified that it "was related to the fact that [she] can't -- because of [her] depression, [she] barely get[s] put of bed.  [She] has so low energy [<u>sic</u>], so little motivation, that [she doesn't] leave [her] house unless [she has] to go to the doctor once a month" (Tr. 41). Plaintiff described her daily activities as sitting at home with the television on, but not watching it, and she stated that she is unable to concentrate (Tr. 42).

Plaintiff testified that she goes for treatment once a month and had been seeing Dr. Nuñez once a month since the beginning of 2011 (Tr. 42).  She also stated that she takes Wellbutrin, Zoloft, Ambien and Abilify (Tr. 43).  She testified that the medications have resolved her suicidal thoughts and

12

visual hallucinations but otherwise have not helped her depres-
sion (Tr. 43-44).  She also testified that the medications give
her muscle aches (Tr. 44).  Finally, plaintiff testified that she
does not spend time with anyone and does not answer the phone
(Tr. 45).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

       1.  <u>Standard of Review</u>

     The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per
curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012);
<u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

     The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d
Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987).
"Even if the Commissioner's decision is supported by substantial

evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); accord Johnson v. Bowen, supra, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration," Johnson v. Bowen, supra, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417, quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per

curiam).   Where, as here, the claimant has submitted new evidence

to the Appeals Council following the ALJ's decision, such evi-

dence becomes part of the administrative record.   See Brown v.

Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Perez v.

Chater, 77 F.3d 41, 45 (2d Cir. 1996).

### 2.   Determination of Disability

A claimant is entitled to SSI and DIB benefits if she

can establish an inability to "engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to

last for a continuous period of not less than twelve months."

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v.

Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inabil-

ity to work must last twelve months).[5]   The impairment must be

demonstrated by "medically acceptable clinical and laboratory

diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D),

and it must be "of such severity" that the claimant cannot

---

[5]The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive DIB benefits under Title II of
the Act.   Barnhart v. Thomas, 540 U.S. 20, 24 (2003).
Accordingly, cases addressing the latter are equally applicable
to cases involving the former.

perform her previous work and "cannot, considering [the claim-
ant's] age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Whether
such work is actually available in the area where the claimant
resides is immaterial.  42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B).

     In making the disability determination, the Commis-
sioner must consider:  "(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience."  Brown v. Apfel, supra, 174 F.3d at 62; DiPalma
v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

     The Commissioner must follow the five-step process
required by the relevant regulations.  20 C.F.R. §§
404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  The first step is a
determination of whether the claimant is engaged in substantial
gainful activity.  20 C.F.R. §§ 404.1520, 416.920(a)(4)(i).  If
she is not, the second step requires determining whether the
claimant has a "severe medically determinable physical or mental
impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).
If she does, the inquiry at the third step is whether any of

16

these impairments meet one of the listings in Appendix 1 of the
regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).  If the answer to this inquiry is affirma-
tive, the claimant is disabled.  20 C.F.R. §§ 404.1520,
416.920(a)(4)(iii).

If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform her past relevant work given her RFC.  20 C.F.R. §§
404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas,
supra, 540 U.S. at 24-25.  If she cannot, then the fifth step
requires assessment of whether, given claimant's RFC, she can
make an adjustment to other work.  20 C.F.R. §§
404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot, she will be
found disabled.  20 C.F.R. §§ 404.1520, 416.920(a)(4)(v); see
Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue,
supra, 697 F.3d at 151.

RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite [her] limitations."
20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC,
the ALJ "identif[ies] the individual's functional limitations or
restrictions and assess[es] his or her work-related abilities on
a function-by-function basis, including the functions in para-

17

graphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."
Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per
curiam), quoting SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996).
The results of this assessment determine the claimant's ability
to perform the exertional demands of sustained work which may be
categorized as sedentary, light, medium, heavy or very heavy.  20
C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330
(JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl,
D.J.).  This ability may then be found to be further limited by
non-exertional factors that restrict the claimant's ability to
work.  See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004),
amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir.
2005); Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

     The claimant bears the initial burden of proving
disability with respect to the first four steps.  Selian v.
Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537
F.3d at 128.  Once the claimant has satisfied this burden, the
burden shifts to the Commissioner to prove the final step -- that
the claimant's RFC allows the claimant to perform some work other
than her past work.  Selian v. Astrue, supra, 708 F.3d at 418;
Butts v. Barnhart, supra, 388 F.3d at 383.

     In some cases, the Commissioner can rely exclusively on
the Medical-Vocational Guidelines ("the Grid") contained in 20

C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995). "The Grid takes into account the claimant's RFC
in conjunction with the claimant's age, education and work
experience. Based on these factors, the Grid indicates whether
the claimant can engage in any other substantial gainful work
which exists in the national economy." Gray v. Chater, supra,
903 F. Supp. at 298; accord Butts v. Barnhart, supra, 388 F.3d at
383.

The Grid may not be relied upon exclusively in cases
where the claimant has nonexertional limitations that signifi-
cantly restrict her ability to work. Butts v. Barnhart, supra,
388 F.3d at 383; Bapp v. Bowen, supra, 802 F.2d at 605-06. When
a claimant suffers from a non-exertional limitation such that she
is "unable to perform the full range of employment indicated by
the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid
fails "to describe the full extent of a claimant's physical
limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the
Commissioner must introduce the testimony of a vocational expert
in order to prove "that jobs exist in the economy which claimant
can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at
384 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-

19

vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

    B.   The ALJ's Decision

        As an initial matter, the ALJ found that plaintiff met
the insured status requirements of the Act through December 31,
2012 (Tr. 14).

        As noted above, the ALJ amended plaintiff's alleged
disability onset date because she found that while plaintiff had
initially alleged a disability onset date of January 1, 2009,
plaintiff had earned almost $2,000 per month through July 2009
(Tr. 14).  Plaintiff agreed to amend the disability onset date to
September 1, 2009, and the ALJ found at the first step of the
disability analysis that plaintiff had not engaged in substantial
gainful activity since that date (Tr. 14).

        At step two, the ALJ found that plaintiff did have a
severe impairment, namely major depression with psychotic fea-
tures (Tr. 15).  The ALJ found that this impairment existed for
more than twelve months based on plaintiff's testimony at the
hearing (Tr. 15).  The ALJ found no evidence of a medically
determinable physical impairment, concluding that plaintiff's

"alleged physical symptoms are attributable to her depressive disorder" (Tr. 15).

At step three, the ALJ found that the plaintiff's impairment, though severe, did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15).  The plaintiff had "no restrictions on activities of daily living, moderate difficulties maintaining social functioning and moderate difficulties maintaining concentration, persistence or pace.  There have been no episodes of decompensation" (Tr. 16).  The ALJ therefore found that plaintiff did not evidence at least two of the listed criteria, and, thus, plaintiff's impairment was not at listing level (Tr. 16).

At step four, the ALJ assessed plaintiff's credibility, finding that her "allegations are not fully supported by the medical record" (Tr. 16).  Specifically she identified discrepancies in plaintiff's description of her symptoms.  The ALJ found that some of plaintiff's claimed symptoms -- suicidal thoughts, shaky hands, insomnia, decreased concentration and memory, anhedonia and auditory hallucinations -- were contradicted by the evidence (see Tr. 16-17).  For example, at the hearing plaintiff testified that she still experienced auditory hallucinations "almost every day sometimes" (Tr. 35).  However, plaintiff had consistently told other treating and consulting sources that

although she had previously had auditory hallucinations, that condition had responded to treatment and was resolved by the summer of 2010 -- one year before the hearing (Tr. 17).  In addition, the ALJ noted that plaintiff denied any suicidal ideations (Tr. 17).

The ALJ accorded the opinion of plaintiff's treating physician Dr. Nuñez "limited weight" because the ALJ found his opinion to be "extremely restrictive and inconsistent with the observations and opinions by the other examining medical sources of record [and it could not] be corroborated or substantiated by clinical observations and findings" (Tr. 18).  The ALJ noted that Dr. Nuñez provided treatment from November 30, 2010 through March 18, 2011, and the ALJ found credible the symptoms that Dr. Nuñez reported (Tr. 18).  Nevertheless, the ALJ found that the func-tional limitations that Dr. Nuñez claimed resulted from those symptoms were "not consistent with the rest of the evidence of record" (Tr. 18).  The ALJ noted that the "one incongruent report [in plaintiff's medical records] is the treatment report by Dr. Nuñez" (Tr. 19).

The ALJ accorded Dr. Alexander, a consultative psychol-ogist, "[g]reat weight" because "he substantiated his opinions with extensive clinical findings" and because his opinions were consistent with the record as a whole (Tr. 19).

The ALJ then found that plaintiff "retain[ed] the residual functional capacity to perform the exertional demands of sedentary work" (Tr. 19).  The ALJ found plaintiff lacked the capacity to perform her past relevant work, which was skilled sedentary work at the medium exertional level (Tr. 19).  Given her restriction to two to three step instructions and occasional contact with coworkers, the ALJ found that plaintiff could perform only unskilled work (Tr. 19).

At step five, the ALJ did not assess the transferability of plaintiff's job skills because the Grid would direct a finding of "not disabled" whether or not plaintiff's skills were transferable (Tr. 20).  The ALJ found that plaintiff could perform work that existed in significant numbers in the national economy because she could perform unskilled sedentary work (Tr. 20).

> If the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by the Medical-Vocational Rule 201.28.  However, the additional limitations have little or no effect on the occupational base of unskilled sedentary work.  A finding of 'not disabled' is therefore appropriate under the framework of Medical-Vocational Rule 201.28.  The claimant's concentration and memory limitations restrict her to an unskilled occupational base.  Her limitation to only occasional contact with coworkers does not significantly affect the unskilled occupational base.  The claimant's additional limitations have only a slight effect on the unskilled sedentary

occupational base.  A decision under the framework of
Medical-Vocational Rule 201.28 is appropriate (SSR 85-
15)

(Tr. 20).  The ALJ therefore found plaintiff not disabled (Tr.
20).

### C.   Analysis of the ALJ's Decision

Plaintiff argues that the ALJ committed legal error by
failing to develop the record with respect to Dr. Nuñez and Dr.
Jolayemi and by failing to obtain a vocational expert at the
fifth step of the disability analysis (Memorandum of Law in
Support of Plaintiff's Cross-Motion for Judgment on the Plead-
ings, dated March 10, 2014 (Docket Item 23) ("Pl.'s Mem.") at 14,
16, 18).

### 1.   Duty to Develop the Record

Plaintiff argues that the ALJ did not fulfill her duty
to develop the record because she should have requested treatment
notes from Dr. Nuñez and Dr. Jolayemi, because the ALJ knew that
both were plaintiff's treating physicians (Pl.'s Mem. at 14, 18).

The ALJ has "an affirmative obligation to fully develop
the administrative record."  Calzada v. Astrue, 753 F. Supp. 2d
250, 269 (S.D.N.Y. 2010) (Sullivan, D.J.) (adopting Report &

24

Recommendation); <u>accord</u> <u>Perez v. Chater</u>, <u>supra</u>, 77 F.3d at 47. "The non-adversarial nature of a Social Security hearing requires the ALJ 'to investigate the facts and develop the arguments both for and against granting benefits.'" <u>Devora v. Barnhart</u>, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002) (Gorenstein, M.J.), <u>quoting</u> <u>Sims v. Apfel</u>, 530 U.S. 103, 111 (2000). This duty is even more important when the information concerns a claimant's treating source. <u>See</u> <u>Devora v. Barnhart</u>, <u>supra</u>, 205 F. Supp. 2d at 172-73.

> [A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. <u>See</u> <u>Schaal</u>, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] <u>sua sponte</u>."); <u>see also</u> <u>Hartnett v. Apfel</u>, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").

<u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999); <u>accord</u> <u>Butts v. Barnhart</u>, <u>supra</u>, 388 F.3d at 386; <u>Rivera v. Comm'r of Soc. Sec.</u>, 728 F. Supp. 2d 297, 322 (S.D.N.Y. 2010) (Sullivan, D.J.).

The ALJ must "seek additional evidence or clarification when the 'report from [the] claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be

based on medically acceptable clinical and laboratory diagnostic
techniques.'" Calzada v. Astrue, supra, 753 F. Supp. 2d at 269,
quoting 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1)(2011)[6]; accord
Norman v. Astrue, 912 F. Supp. 2d 33, 42 (S.D.N.Y. 2012) (Carter,
D.J.); see Rosa v. Calahan, supra, 168 F.3d at 79; Clark v.
Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

        The regulations state that "'[w]hen the evidence we
receive from your treating physician . . . or other medical
source is inadequate for us to determine whether you are dis-
abled, . . . [w]e will first recontact your treating physician
. . . or other medical source to determine whether the additional
information we need is readily available.'" Perez v. Chater,
supra, 77 F.3d at 47 (alterations in original), quoting 20 C.F.R.
§§ 404.1512(e), 416.912(e)(2011).  The applicable regulations
state that the ALJ must "make every reasonable effort to help [a
claimant] get medical reports from [her] own medical sources."
20 C.F.R. §§ 404.1512(d), 416.912(d).  Where, as here, a claimant

---

        [6]The Commissioner amended these regulations on March 26,
2012 to remove former paragraph (e) and the duty it imposed on
ALJs to re-contact a disability claimant's treating physician
under certain circumstances.  How We Collect and Consider
Evidence of Disability, 77 Fed. Reg. 10651, 10651 (Feb. 23, 2012)
(codified at 20 C.F.R. pts. 404, 416).  The earlier versions of
Sections 404.1512(e) and 416.912(e) quoted here were in effect
when ALJ Reich adjudicated plaintiff's DIB and SSI claims, and,
therefore, they apply here.  Lowry v. Astrue, 474 F. App'x 801,
804 n.2 (2d Cir. 2012).

appeared <u>pro</u> <u>se</u>,[7] this obligation is heightened.  <u>Cruz v.</u>
<u>Sullivan</u>, 912 F.2d 8, 11 (2d Cir. 1990), <u>citing</u> <u>Echevarria v.</u>
<u>Sec'y of Health & Human Servs.</u>, 685 F.2d 751, 755 (2d Cir. 1982);
<u>Jones v. Apfel</u>, 66 F. Supp. 2d 518, 523 (S.D.N.Y. 1999) (Pauley,
D.J.).

          a.   <u>Dr. Nuñez</u>

        Plaintiff argues that the ALJ did not fulfill her duty
to develop the record because she should have requested treatment
notes from Dr. Nuñez (Pl.'s Mem. at 14).  Plaintiff contends that
the lack of records from Dr. Nuñez created a critical gap in the
record because there were no treatment records from plaintiff's
treating psychiatrist for the entire year preceding the hearing
date (Pl.'s Mem. at 18).

        The Commissioner responds that the ALJ satisfied her
duty to develop the record with respect to Dr. Nuñez, as the
record contained "ample evidence" of plaintiff's condition (Reply
Memorandum of Law in Further Support of the Commissioner's Motion
for Judgment on the Pleadings and in Opposition to Plaintiff's

---

     [7]While plaintiff is represented by counsel at this stage of
her appeals process, she appeared <u>pro</u> <u>se</u> until after the filing
of her complaint in this Court.

Cross-Motion for Judgment on the Pleadings, dated April 10, 2014 (Docket Item 21) ("Comm'r Reply") at 6).

The ALJ's failure to obtain further records from Dr. Nuñez is problematic here because he was a significant treating source, the balance of the medical record is sparse and the absence of supporting documentation was one of the critical reasons given by the ALJ for discounting Dr. Nuñez's opinion.

Plaintiff began receiving treatment from Dr. Nuñez at the end of November 2010, and thereafter saw him on a monthly basis through the date of the hearing on January 3, 2012.  The only evidence from Dr. Nuñez in the record is the questionnaire dated April 4, 2011.  Aside from the fact that no supporting treatment notes were submitted, the date of the questionnaire means that it covers only four months of plaintiff's treatment and leaves a nine-month gap in the treatment record.  The only other evidence in the record, apart from the report by Dr. Jolayemi submitted to the Appeals Council after the ALJ's decision, that covers the time plaintiff was in treatment with Dr. Nuñez are the reports from the SSA consultative examiners who saw plaintiff a single time in May 2011, the FEGS Function Reports

prepared by non-physicians and a FEGS Wellness Summary that relied on the opinion of plaintiff's treating physician.[8]

The record does not indicate whether the ALJ sought additional documents from Dr. Nuñez.  It was incumbent upon the ALJ to obtain the treatment notes or to re-contact Dr. Nuñez regarding the conclusions in his questionnaire and his treatment of plaintiff during the remainder of the relevant time period before rejecting his opinion as insufficiently supported and inconsistent with the majority of the evidence.  Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) (Marrero, D.J.) ("The ALJ cannot rely on the absence of evidence, and is thus under an affirmative duty to fill any gaps in the record.") (emphasis in original); see Rosa v. Callahan, supra, 168 F.2d at 79.  This is particularly true when the missing documents relate to a treating source.  See Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 756 ("[T]he proper course would have been to direct [plaintiff] to obtain a more detailed statement

---

[8]While I review the ALJ's decision here only for legal error, I note that the ALJ's failure to obtain documentation (other than a single report covering four months out of over two years of alleged disability) from the only physician who treated plaintiff for a substantial period of time makes it difficult to understand how the ALJ's decision could be supported by substantial evidence, especially given that plaintiff's application for disability is premised entirely on limitations caused by psychological disorders.

from the treating physicians."); Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000) (Scheindlin, D.J.) ("The Social Security regulations give special evidentiary weight to the opinion of a treating physician when diagnosing the nature and severity of a plaintiff's condition."), citing Clark v. Comm'r of Soc. Sec., supra, 143 F.3d at 118.

The ALJ's unexplained failure to seek additional records from Dr. Nuñez warrants the remand of this matter.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record . . . , we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.").

b.   Dr. Jolayemi

Plaintiff next contends that the ALJ erred by failing to request documentation regarding Dr. Jolayemi's treatment of plaintiff given that plaintiff identified Dr. Jolayemi as a treating physician (Pl.'s Mem. at 18).  The Commissioner responds that the restrictive limitations described by Dr. Jolayemi are inconsistent with the record and of "limited value" because the record shows plaintiff's condition improved at the beginning of 2011 (Comm'r Reply at 6).

30

The record is not clear as to Dr. Jolayemi's role in plaintiff's treatment, and the ALJ should have attempted to obtain clarification.  Although plaintiff identified Dr. Jolayemi as a treating source in her application for benefits (Tr. 168), plaintiff claimed in that application that she saw Dr. Jolayemi only in December 2010 (Tr. 168).  The application, submitted in February 2011, stated that plaintiff had scheduled no further appointments with Dr. Jolayemi (Tr. 168).

Nevertheless, the ALJ should have explored whether additional records could have been obtained from Dr. Jolayemi, given plaintiff's identification of Dr. Jolayemi as a treating source in her FEGS reports of October 14, 2010 and November 8, 2010.  The October 14, 2010 report also states that plaintiff had seen Dr. Jolayemi within the preceding month.  These dates are inconsistent with the statements in plaintiff's application for benefits.  The record of treatment with Dr. Jolayemi is further confused by plaintiff's identification of Dr. Jolayemi as a prescribing physician in December 2011 (Tr. 171).  The ALJ did not explore or try to resolve these inconsistencies.  Considering the importance of opinions from treating physicians in the determination of disability and the significant gaps in plain-tiff's medical record, the ALJ should have requested further information from Dr. Jolayemi.  This defect has not been cured by

the submission of a Treating Physician Report from Dr. Jolayemi
to the Appeals Council (Tr. 283-84).  That report is dated
December 28, 2010 and fails to clarify the length or frequency of
the treatment relationship.

Thus, the ALJ's failure to develop the record with
respect to Dr. Jolayemi also warrants remanding this matter.

2.   Vocational
     Expert

Plaintiff's last contention is that, given plaintiff's
nonexertional limitations, the ALJ should have secured testimony
from a vocational expert to determine whether plaintiff could
perform other work available in the national economy (Pl.'s Mem.
at 16).  The Commissioner responds that a vocational expert was
unnecessary because the ALJ found that plaintiff's restrictions
had only a slight impact on her occupational base of unskilled
sedentary work and that as a result, the ALJ's use of the Grid
was appropriate (Memorandum of Law in Support of the Commis-
sioner's Motion for Judgment on the Pleadings, dated December 6,
2013 (Docket Item 13) at 24).

"[T]he 'mere existence of a nonexertional impairment
does not automatically . . . preclude reliance on the [Grid].'"
Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010) (second

32

alteration in original), <u>quoting</u> <u>Bapp v. Bowen</u>, <u>supra</u>, 802 F.2d
at 603.  However, if the nonexertional impairment has more than
negligible impact on plaintiff's employment opportunities, a
vocational expert is necessary.

> We have explained that the ALJ cannot rely on the
> Grids if a non-exertional impairment has any more than
> a "negligible" impact on a claimant's ability to per-
> form the full range of work, and instead must obtain
> the testimony of a vocational expert.  <u>See</u> <u>Zabala v.</u>
> <u>Astrue</u>, 595 F.3d 402, 411 (2d Cir. 2010); <u>see</u> also <u>Saiz</u>
> <u>v. Barnhart</u>, 392 F.3d 397, 400 (10th Cir. 2004) (<u>per</u>
> <u>curiam</u>).  A nonexertional impairment is non-negligible
> "when it . . . so narrows a claimant's possible range
> of work as to deprive him of a meaningful employment
> opportunity."  <u>Zabala</u>, 595 F.3d at 411 (internal quota-
> tions marks omitted).

<u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 421 (alteration in origi-
nal); <u>accord</u> <u>Bapp v. Bowen</u>, <u>supra</u>, 802 F.2d at 605 ("[W]e hold
that application of the grid guidelines and the necessity for
expert testimony must be determined on a case-by-case basis.");
<u>Hillard v. Colvin</u>, 13 Civ. 1942 (AJP), 2013 WL 5863546 at *17
(S.D.N.Y. Oct. 31, 2013) (Peck, M.J.).  Plaintiff's depression
and inability to follow detailed instructions are plainly non-
exertional limitations.  <u>See</u> 20 C.F.R. §§ 404.1569a(c),
416.969a(c).

> Unlike determining a disability where the claimant has
> an exertional impairment, the rules do not direct
> factual conclusions of disabled or not disabled for
> individuals with solely nonexertional types of impair-
> ments.  In the evaluation of disability where the
> individual has solely a nonexertional type of impair-

> ment, determination as to whether disability exists
> shall be based on the principles in the appropriate
> sections of the regulations, giving consideration to
> the rules for specific case situations.

Jehn v. Barnhart, 408 F. Supp. 2d 127, 134-35 (E.D.N.Y. 2006)

(citations, quotation marks and alteration omitted), quoting 20

C.F.R. pt. 404, subpt. P, app. 2, Rule 200.00(e)(1); see also SSR

85-15, 1985 WL 56857 at *3-*4 (Jan. 1, 1985) (describing use of

the Grid for assessing solely nonexertional limitations and

noting that use of a vocational expert is not necessarily re-

quired).

Here the ALJ did consider whether plaintiff's occupa-

tional base was narrowed significantly by her nonexertional

limitations.  At step five of the disability analysis, the ALJ

found that plaintiff's impairments limited her to unskilled

sedentary work (Tr. 20).  The ALJ then considered whether and to

what degree plaintiff's impairments would further limit her

occupational base (Tr. 20).

> If the claimant had the residual functional capacity to
> perform the full range of sedentary work, considering
> the claimant's age, education, and work experience, a
> finding of 'not disabled' would be directed by the
> Medical-Vocational Rule 201.28.  However, the addi-
> tional limitations have little or no effect on the
> occupational base of unskilled sedentary work.  A
> finding of 'not disabled' is therefore appropriate
> under the framework of Medical-Vocational Rule 201.28.
> The claimant's concentration and memory limitations
> restrict her to an unskilled occupational base.  Her
> limitation to only occasional contact with coworkers

34

> does not significantly affect the unskilled occupa-
> tional base.  The claimant's additional limitations
> have only a slight effect on the unskilled sedentary
> occupational base.  A decision under the framework of
> Medical-Vocational Rule 201.28 is appropriate (SSR 85-
> 15)

(Tr. 20).  The ALJ found that he could rely on the Grid in this

situation because plaintiff's nonexertional limitations did not

significantly restrict her occupational base of unskilled seden-

tary work.  See Bapp v. Bowen, supra, 802 F.2d at 605 ("If the

guidelines adequately reflect a claimant's condition, then their

use to determine disability status is appropriate.").  The ALJ's

use of Rule 201.28 also took into account plaintiff's age,

education and ability to communicate in English.  See SSR 85-15,

supra, at *3 ("[The] issue is whether the person can be expected

to make a vocational adjustment considering the interaction of

his or her remaining occupational base with his or her age,

education, and work experience.").

Because the ALJ analyzed whether plaintiff's impair-

ments had only a negligible impact on plaintiff's unskilled

sedentary occupational base and found that they did, he did not

commit legal error by relying on the Grid in making his determi-

nation and not obtaining the testimony of a vocational expert.

See Selian v. Astrue, supra, 708 F.3d at 422 (remanding for ALJ

to determine whether plaintiff's nonexertional limitations were

35

negligible); Zabala v. Astrue, supra, 595 F.3d at 411; Cornell v. Colvin, 12 Civ. 1127 (JTC), 2014 WL 1572342 at *9 (W.D.N.Y. Apr. 18, 2014); Howe v. Colvin, 12 Civ. 6955 (JPO)(SN), 2013 WL 4534940 at *18 (S.D.N.Y. Aug. 27, 2013) (Oetken, D.J.) (adopting Report & Recommendation) (finding ALJ did not commit legal error when using the Grid as a framework and finding plaintiff's nonexertional limitations had "little or no effect on the occupational base of unskilled sedentary work").

Whether the ALJ's decision not to use a vocational expert was appropriate given the evidence in the record is a separate question and need not be addressed here, since "[o]nly after finding that the correct legal standards were applied should the Court consider the substantiality of the evidence." Calabrese v. Astrue, 592 F. Supp. 2d 379, 385 (W.D.N.Y. 2009), aff'd, 358 F. App'x 274 (2d Cir. 2009) (summary order), quoting Johnson v. Bowen, supra, 817 F.2d at 985; see also Schaal v. Apfel, supra, 134 F.3d at 504 ("'Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.'" (quoting Johnson v. Bowen, supra, 817 F.2d at 986)).

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-
fully recommend that the Commissioner's motion for judgment on
the pleadings be denied and plaintiff's cross-motion for judgment
on the pleadings be granted to the extent of remanding this
matter to the Commissioner pursuant to sentence four of 42 U.S.C.
§ 405(g) for further proceedings consistent with this report and
recommendation.

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Edgardo Ramos, United States District Judge, 40 Foley Square,
Room 410, and to the Chambers of the undersigned, 500 Pearl
Street, Room 750, New York, New York 10007.  Any requests for an
extension of time for filing objections must be directed to Judge
Ramos.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT

37

IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.

Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male

Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.

Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:   New York, New York
         November 17, 2014

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

William P. Gottlieb, Esq.
Axelrod & Gottlieb
396 Broadway, Suite 902
New York, New York 10013

Joseph A. Pantoja, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007

38